Mr. Hall. Good morning. May it please the Court. I'm David Hall. I'm here on behalf of now the estate of William J. Burford. Mr. Burford, the original appellant, having passed away to independency of the appeal. Mr. Burford and his case were before this Court once previously on a breach of contract claim where the defendants had moved for summary judgment on Mr. Burford's breach of contract claims on the basis that the agreement between the parties was terminable at will as it renewed automatically and had no objective basis for termination. This Court reversed that ruling and sent the case back to the Southern District of Illinois where trial was sued. We had argued before the District Court that having taken a position that the contract had no objective basis for termination that the defendant should not be allowed at trial to take a completely contrary position and say that now that they had terminated Mr. Burford for failing to meet his minimum yearly sales volume. The defendant had made clear all along in the case that one of its alternative grounds for prevailing was that they had good cause, correct? It was through the interrogatory answers, through the pretrial filings, etc. It's simply that they decided not to file for summary judgment on that theory. Well, that's an interesting point. That is their position. Their interrogatory answers, which they served in March 7, 2013, did list the minimum sales volume as one of their basis for termination. The answer to the complaint actually was not filed until July of 2013. And the answer to the complaint did not plead any... It doesn't have to. All it needs to do is say denied, right? I guess I find your position, Mr. Hall, very peculiar here. Okay. First of all, you seem to be saying that a party that doesn't file for summary judgment on a particular issue loses the ability to raise that issue at trial. No, I'm not saying that at all. Good. I'm saying that having taken one position as to why they can avoid performance on the contract, having taken that position and pursued it through the appeal, that they can't... They've got alternative grounds. I mean, you're familiar with the doctrine of judicial estoppel, right? Correct. Where if you win by saying that X is true, you can't try to win another case by saying X is false, right? Correct. Well, here they argued X is true, we can terminate this at will, and they lost on that issue. That doesn't preclude them from offering other defenses. Not entirely, but under the doctrine of men the whole, it does work. Under men the whole doesn't have anything to do with this. Okay. The federal rules allow alternative and inconsistent pleading, and these aren't even inconsistent defenses. Well, when you look at their motion for summary judgment, they're arguing that the contract has no objective-based determination. Yes, and they lost on that. And when they were before this court previously in their brief for this court, they ridiculed our claim that... And you won and they lost. Correct. So that doesn't end the case. If I understand your position correctly at this point, Mr. Hall, your position is that Mr. Burford had an exclusive territory in perpetuity with no performance requirements. Is that right? No. I mean, our position is, you know, he was subject to the agreement. But he wasn't subject to any sales quotes, right? Well, I think due to a couple of actions that the defendants had taken. But your position is that he had a right to stay in that territory exclusively because of what you argue was a waiver of the sales quotas, the production requirements, and to do that indefinitely. Right. I mean, that's a separate issue from the men the whole. And, well, I know it's a separate issue, I have never heard anywhere in commerce in this country of somebody having an exclusive territory with no performance requirements. Well, it did have performance requirements. But, you know, by the actions of the defendants, you know, it's our position that they waive those as a reason to terminate him. But your position is that on this unusual waiver theory that they didn't terminate him as soon as they could have, that they waived their right to do it later, and so that he could keep that territory without any performance obligations indefinitely. Well, if they wanted to remove him from the territory, they would have to suffer the consequences of terminating the agreement. And if that gave rise to damages for a breach, then they would be subject to those damages. There's nothing that would prevent them from, nothing that did prevent them from terminating him. But it would have been a breach in your view. Correct. Can you point me to any other case where somebody had that kind of privilege? Exclusive territory without the ability to remove for cause for failure to produce? Well, I think the only reason, you know, you're getting to a point where the defendants are basically, by their own conduct, they're trying to make the contract terminal at will again by not enforcing a right they had. I don't think so, but okay. You know, I think in terms of waiver of a contract right, this court's Saberslack decision where the party knew of the breach and continued in a relationship for another seven years and continued to accept the benefits of the relationship, this court found that that party had waived that. Which case was that? Saberslack. It was a Seventh Circuit case. But in that case, the party continued accepting payments under the contract, and this court found that having continued to accept those benefits, that the party could not then go back and pursue that breach. And that's similar to what happened here in that knowing that Mr. Burford had not met the minimum sales volume, APS did continue to accept commission payments from him on the sales he did make, and they also continued to encourage him to market under the accounting practice sales name. The company's marketing program was largely done by having the brokers send out direct mailers, you know, advertising the company, but the responses would come back to accounting practice sales, the central corporate office, so that a large part of the benefit of those marketing efforts. Okay. I don't understand this argument. It's an argument that by continuing him as one of their distributors, they waive the right to terminate him. That makes no sense. Well, I mean, under contract law, when a party has a right that they know about and they don't enforce it or they continue as though they're not going to enforce it, that right can be waived. Looking retrospectively, that might be so. But your argument would compel somebody in the defendant's position to pull the trigger and terminate a contract, not work with somebody whose performance is below par, not try to rehabilitate the operation. They have to pull the trigger and the relationship now or never be able to in the future. Well, or make a subsequent agreement to say that, you know, you haven't met the standards and, you know, we are going to, you know, we'll let you continue, but we may. The question here is not whether he was deprived of past commissions earned. No. Okay. That might be, your argument might be plausible in that situation. That's not what's going on here. You're suing for wrongful termination, and there is no principle of contract law that requires, in this situation, a manufacturer to continue a distributor who is underperforming when the contract permits termination for under or non-performance. Well, but under principle of contract law, you know, a party with a right to terminate a contract can give up that right. After how many years of non-performance, in your view, did the defendant waive the right to terminate for non-performance? Well, in this case, I believe it was four years of non-performance in our case. So if they'd fired, if they'd terminated after three years, that would have been okay? You know, I don't know if there's a, you know, what that. Well, this is a pretty important practical question for business people, right? Correct. Because if we were to accept your theory that indulgence of somebody who's underperforming results in waiver of the right to terminate their exclusive territory, then that's a very dangerous proposition for the upstream company, and they would have to know, well, if we let this go any longer, this Burford case is going to mean that we have lost our right to terminate, so we've got to terminate right away. Well, I mean, I think it can also be compacted around by making, you know, another agreement in order to continue. Why should somebody agree? Why should the distributor in that situation agree? You guys have waived your right. I get to keep your territory and laze around in it for years to come. Well, I mean, that agreement could be entered into, you know, immediately upon, you know, when they don't meet the standards. But the other thing is it's not entirely one-sided where we're just saying he gets to continue forever. The waiver arises through the fact that they're also reaping benefits from this and that he's working to develop the territory and build up their name recognition in the territory. Not enough, apparently, right? Well, I mean, there were a lot of other factors that went into that. It was a terrible economy at that time. Right. And, you know, the different territories, different states had different effects from that. I would like to briefly also touch on the Exhibit 13 that we argued the court erred in not admitting. And we think that there are basically a couple of reasons why exclusion of that affected the outcome of the trial. One of those had dealt with marketing expenditures as a means to hold a territory and said that that, you know, in the future that would be a factor in franchise agreements but had not been enforced previously. If that had been entered, that bolstered Mr. Burford's testimony that he was told that by spending enough on marketing, he could keep his territory regardless of sales. And it also contradicts the testimony of Gary Holmes where he said nothing like that had ever been told to the brokers. The other big thing that that shows is on the minimum production requirements. It's a written admission by APS that they had never enforced those previously. So that also contradicts the testimony of Mr. Holmes that they had never, you know, waived those production requirements and that they always intended to enforce them. And it also bolstered Mr. Thank you. Your time has expired. Thank you. Mr. Grady. Your Honors, good morning and may it please the Court. The law of this case on the remand was that Mr. Burford's poor performance would constitute good cause for APS to terminate the contract. And Mr. Burford had a fair trial on the merits. The jury simply rejected his argument that he'd met his minimum yearly sales volume and it rejected his argument that he'd waived his termination, that APS had waived its right to terminate him for failing to meet that number. And now this Court should reject all of Mr. Burford's reasons for setting that jury verdict aside. First, the mend the hold argument that has already been discussed, there's one additional thing that I'd like to highlight, which is that we attached, APS attached to its interrogatory answer, a calculation of the minimum yearly sales volume for 2011 that we identified as the number that Mr. Burford had to meet. And the evidence at trial was that he came 20 percent below that number. So there is no surprise that can be claimed by Mr. Burford at all, because he not only had the defense listed in the interrogatory answer, but we attached the actual numbers that would go along with that defense. And in fact, when he was terminated, that was the reason given, that he was failing to produce as required by the contract? That is correct, Your Honor. So there can't have been any surprise here? No surprise. In fact, in a pretrial conference in November 2013, counsel for Mr. Burford explained to the judge that it always had been Mr. Burford's understanding that there were two different reasons that were given by APS for the termination. One was that APS could terminate him for a lack of sales volume, and the other one was it was terminable at will because it was perpetual, which of course this Court resolved the other way. Now, with regard to Exhibit 13, it's very important to draw the Court's attention to this central fact in Exhibit 13. This was a franchise document. APS was considering moving to a franchise model instead of just simply having brokers that were pursuant to a contract. The nickname of the document is the FFAQ, which is the Franchise Frequently Asked Questions. This is a four-page, single-spaced document, and the plaintiff, Mr. Burford, wanted to draw two things from it. It was a very confusing document for the jury, and the district court did not abuse its discretion in keeping it out. Well, and it was in the essence of an explanation of this new model that the company might be going to and what the production quotas would be under the franchise model, correct? That's correct. It doesn't speak to the requirements of the contract at issue in this case. Of Mr. Burford's individual contract, that is correct. In fact, the evidence of trial was that only two APS brokers had a contract with the minimum yearly sales volume calculation that was specific to Mr. Burford. Exhibit 13 referenced something called a minimum production requirement, which was not the same thing. Mr. Burford's contract had a rather unusual way of calculating the volume minimum. There was something called InfoUSA, which is referenced in the contract, which is essentially the number of accounting practices that are available in particular zip codes. That's how the calculation was derived, using that as the denominator. This minimum production requirement that's referenced in Exhibit 13 doesn't say anything about that, and there was no evidence of trial as to what it would have been, and the reason is that it was a franchise minimum production requirement, and Mr. Burford not only was not a franchisee, he testified he didn't want to become a franchisee. So he's trying to use a franchise document to prove a case that is not only not a franchise case, but he testified he didn't want to be a franchisee. So the district court properly excluded this. It would have been very confusing to the jury, and the rest of the four single-space pages dealt with stuff that had absolutely nothing to do with the case because it was all franchise. So that was a correct ruling, and the court should not set that aside. The other focus of this court colloquy with Mr. Hall was waiver, and there's something that was not yet discussed that I want to bring up, which is a meeting that occurred in March of 2010. The evidence at trial was that APS was aware that Mr. Burford had had some challenges and why maybe he didn't meet his numbers. Mr. Gary Holmes, who is the president of APS, testified that APS was aware that Mr. Burford had had some health problems. Mr. Burford had been involved in a lawsuit, a different lawsuit, which had distracted possibly from his production, and the economy in 2008 and 2009 was brutal for APS, and APS was aware of that. So in March of 2010, it met with Mr. Burford, and this was on the trial transcript, and Mr. Burford said, I recognize that I have to change things to do better. And APS said, even discussed the fact that Mr. Burford had a year with no sales at all. So APS gave Mr. Burford another chance, and Mr. Burford's trying to take that chance and turn it into a weapon against APS, forcing contracting parties to terminate a contract at the first available opportunity, rather than trying to be fair with somebody and giving them more time to possibly meet their number. In closing to the jury, we argued that that was not fair for Mr. Burford to try to do that, and that there was a commercial reason that APS wanted to give him another chance, because it wanted to be fair to its brokers. What's your understanding of the legal basis for the plaintiff's theory on this point? On the waiver point? On this, what's the legal basis for that? I really don't understand the legal basis for that argument. What was, how was the jury instructed on that? Well, the jury was instructed that waiver has to be proved by clear and convincing evidence, and that it's the intentional relinquishment of another... Waiver, I don't understand the terminology waiver in the contract context. Was it in the nature of an amendment to the contract that we're going to remove these production quotas? So it was... So that we can never fire you for lack of production? What's the legal theory? It was waiver of our contract right to terminate him in the event of his poor performance. In other words, the law... Perpetually? Yes, that's exactly right. What's the Illinois law support for that theory? We don't believe there is any, Judge. But the judge permitted it to go to the jury. I'm sorry, I thought you were talking about there's no Illinois law for support of the idea that the waiver could occur. No. So let me be clear. The law of the case coming down was that if there was no minimum yearly sales volume met, that Mr. Burford could be terminated by APS. Mr. Burford's argument at trial was that APS gave up that right by not exercising it for a period of years. That was his waiver argument. The waiver was APS's right to terminate. And you're correct that the waiver would result in a perpetual relationship between Mr. Burford and APS that only Mr. Burford could end. Right. And what's the legal support for that in Illinois law? That that's an appropriate defense. As applied. Offense. There is none. Because the effect would be that you would have a perpetual contract. Right. But that's the issue that was tried. Right. Evidently. Right. In any event, the jury didn't credit it, and we have the verdict form, which is attached to the opening brief, shows that they found that number one, the minimum yearly sales volume was not met, and number two, there was no waiver. The sufficiency argument that Mr. Burford is raising to the jury's verdict on waiver is waived, because at the close of evidence he did not move under Rule 50A. So he is procedurally barred from challenging the jury's verdict on waiver. And even if he's not barred, we believe that there was ample evidence in the record to support the jury's finding. If there are no other questions. No constitutional requirement for you. You use all your time. If there are no further questions, I will conclude my argument. Thank you very much. Thank you, Mr. Grady. Our thanks to both counsel. The case is taken under advisement.